1   Robert J. Nelson (State Bar No. 132797)
    rnelson@lchb.com
2   Fabrice N. Vincent (State Bar No. 160780)
    fvincent@lchb.com
3   Jacob H. Polin (State Bar No. 311203)
    jpolin@lchb.com
4   LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
    275 Battery Street, 29th Floor
5   San Francisco, CA  94111-3339
    Telephone:  415.956.1000
6   Facsimile:  415.956.1008

7   Alexandra L. Foote (State Bar No. 225695)
    LAW OFFICE OF ALEXANDRA L. FOOTE, P.C.
8   275 Battery Street, 29th Floor
    San Francisco, CA  94111-3339
9   Telephone:  786.408.8083
    Facsimile:  415.956.0561

10
    *Attorneys for Plaintiffs*
11  Nari Suda LLC and Pakin Corporation

12              UNITED STATES DISTRICT COURT

13             NORTHERN DISTRICT OF CALIFORNIA

14                SAN FRANCISCO DIVISION

15

16  Nari Suda LLC, a Delaware corporation,      Case No. 4:20-cv-3057-JSW
    dba Nari and Pakin Corporation, a
17  California corporation, dba Kin Khao, on    **OPPOSITION TO MOTION TO DISMISS**
    behalf of themselves and all others         **AMENDED COMPLAINT AND REQUEST**
18  similarly situated,                         **TO STAY PROCEEDINGS**

19                     Plaintiffs,             Date:      August 7, 2020
                                               Time:      9:00 a.m.
20         v.                                  Judge:     The Honorable Jeffrey S. White
                                               Location: Courtroom 5
21  Oregon Mutual Insurance Company, an
    Oregon corporation,
22
                       Defendant.
23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

I. SUMMARY OF ARGUMENT ........................................................................... 1

II. FACTUAL BACKGROUND ............................................................................ 2

III. REQUEST TO STAY PROCEEDINGS .......................................................... 4

IV. PRINCIPLES OF INSURANCE POLICY INTERPRETATION ...................... 5

V. ARGUMENT ..................................................................................................... 5

    A. Plaintiffs' Civil Authority Claim is Based on a Reasonable Interpretation of the Policy.............................................................................................. 5

        1. The Orders Were Issued In Response to Physical Damage. ..................... 5

        2. The Orders Prohibited Access to the Restaurants. ................................... 7

    B. Plaintiffs' Business Income Claim is Based on a Reasonable Interpretation of the Policy. ......................................................................................... 9

        1. Defendant Ignores the Term "Loss" Whose Plain Meaning Extends Coverage Beyond Material Transformations of Property.......................... 9

        2. Deprivation of Functionality Triggers Coverage. .................................... 11

        3. Defendant Has Not Established that a Material Change in Condition is Required. ............................................................................................. 13

    C. No Policy Exclusions Apply to These Losses. ..................................... 15

VI. CONCLUSION ................................................................................................. 16

# TABLE OF AUTHORITIES

**Page**

## CASES

*54th St. Ltd. Partners, L.P. v. Fid. & Guar. Ins. Co.*,
   763 N.Y.S.2d 243 (2003) ........................................................................................... 7

*AIU Ins. Co. v. Superior Court*,
   51 Cal. 3d 807 (1990) ................................................................................................. 5

*Cooper v. Travelers Indem. Co. of Illinois*,
   No. C-01-2400-VRW, 2002 WL 32775680 (N.D. Cal. Nov. 4, 2002) ..................... 12

*Dickie Brennan & Co. v. Lexington Ins. Co.*,
   636 F.3d 683 (5th Cir. 2011) ...................................................................................... 7

*E.M.M.I., Inc. v. Zurich Am. Ins. Co.*,
   32 Cal. 4th 465 (2004) ................................................................................................ 5

*Edmunds Mgmt. Co. v. Century Sur. Co.*,
   No. 70441, 1997 WL 321119 (Ohio Ct. App. June 12, 1997) .................................. 16

*Essex Ins. Co. v. Bloom South Flooring Corp.*,
   562 F.3d 399 (1st Cir. 2009) ..................................................................................... 11

*Farmers Ins. Co. of Oregon v. Trutanich*,
   123 Or. App. 6 (1993) ........................................................................................... 12, 13

*Farmers Ins. Exch. v. Knopp*,
   50 Cal. App. 4th 1415 (1996) .................................................................................. 9, 10

*Gen. Mills, Inc. v. Gold Medal Ins. Co.*,
   622 N.W.2d 147 (Minn. Ct. App. 2001) ................................................................... 14

*Good v. Prudential Ins. Co. of Am.*,
   5 F. Supp. 2d 804 (N.D. Cal. 1998) ............................................................................ 4

*Gray v. Zurich Ins. Co.*,
   65 Cal. 2d 263 (1966) ............................................................................................. 5, 15

*Hughes v. Potomac Ins. Co. of D.C.*,
   199 Cal. App. 2d 239 (Ct. App. 1962) .................................................................. 11, 12

*Landis v. N. Am. Co.*,
   299 U.S. 248 (1936) ..................................................................................................... 4

*Lotes Co. v. Hon Hai Precision Indus. Co.*,
   No. C 11-01036 JSW, 2011 WL 13152817 (N.D. Cal. July 14, 2011) ...................... 8

*MacKinnon v. Truck Ins. Exch.*,
   31 Cal. 4th 635 (2003) ................................................................................................. 5

*Mama Jo's, Inc. v. Sparta Ins. Co.*,
   No. 17-CV-23362-KMM, 2018 WL 3412974 (S.D. Fla. June 11, 2018) .................. 13

*Motorists Mut. Ins. Co. v. Hardinger*,
   131 F. App'x 823 (3d Cir. 2005) ....................................................................... 1, 12, 15

*MRI Healthcare Ctr. of Glendale, Inc. v. State Farm Gen. Ins. Co.*,
   187 Cal. App. 4th 766 (2010) ............................................................................... 10, 13

**TABLE OF AUTHORITIES**
(continued)

Page

*Nautilus Grp., Inc. v. Allianz Glob. Risks US*,
No. C11-5281BHS, 2012 WL 760940 (W.D. Wash. Mar. 8, 2012)........................................... 9

*Palmer v. Truck Ins. Exch.*,
21 Cal. 4th 1109 (1999) ................................................................................................... 9, 10

*Pennsylvania Coal Co. v. Mahon*,
260 U.S. 393 (1922) ............................................................................................................. 10

*Philadelphia Parking Auth. v. Fed. Ins. Co.*,
385 F. Supp. 2d 280 (S.D.N.Y. 2005)..................................................................................... 8

*Port Auth. of New York & New Jersey v. Affiliated FM Ins. Co.*,
311 F.3d 226 (3d Cir. 2002)......................................................................................... 6, 11, 12

*Reese v. Travelers Ins. Co.*,
129 F.3d 1056 (9th Cir. 1997)................................................................................................. 5

*Rivers v. Walt Disney Co.*,
980 F. Supp. 1358 (C.D. Cal. 1997) ....................................................................................... 4

*Sabella v. Wisler*,
59 Cal. 2d 21 (1963) ............................................................................................................. 11

*Santa Clara Cty. v. Curtner*,
245 Cal. App. 2d 730 (Ct. App. 1966)................................................................................... 14

*Shade Foods, Inc. v. Innovative Prod. Sales & Mktg., Inc.*,
78 Cal. App. 4th 847 (2000), *as modified on denial of reh'g* (Mar. 29, 2000) ......................... 16

*Source Food Tech., Inc. v. U.S. Fid. & Guar. Co.*,
465 F.3d 834 (8th Cir. 2006).................................................................................................. 14

*Southlanes Bowl, Inc. v. Lumbermen's Mut. Ins. Co.*,
46 Mich. App. 758 (1973)........................................................................................................ 8

*State Farm Mut. Auto. Ins. Co. v. Jacober*,
10 Cal. 3d 193 (1973) ................................................................................................... 5, 14, 15

*Strickland v. Fed. Ins. Co.*,
200 Cal. App. 3d 792 (Ct. App. 1988)................................................................................... 11

*Syufy Enterprises v. Home Ins. Co. of Indiana*,
No. 94-0756 FMS, 1995 WL 129229 (N.D. Cal. Mar. 21, 1995)............................................ 8

*Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*,
535 U.S. 302 (2002) ............................................................................................................. 10

*Total Intermodal Servs. Inc. v. Travelers Prop. Cas. Co. of Am.*,
No. CV 17-04908 AB (KSX), 2018 WL 3829767 (C.D. Cal. July 11, 2018) ................... 1, 9, 10

*TRAVCO Ins. Co. v. Ward*,
715 F. Supp. 2d 699 (E.D. Va. 2010), *aff'd*, 504 F. App'x 251 (4th Cir. 2013)....................... 15

*United Air Lines, Inc. v. Insurance Co. of the State of Pennsylvania*,
439 F.3d 128 (2d Cir. 2006).................................................................................................... 6

*Universal Sav. Bank v. Bankers Standard Ins. Co.*,
No. B159239, 2004 WL 515952 (Cal. Ct. App. Mar. 17, 2004) .............................................. 9

*W. Fire Ins. Co. v. First Presbyterian Church*,
165 Colo. 34 (1968) ....................................................................................................... 11, 12

1

## I.  SUMMARY OF ARGUMENT

Plaintiffs operate two celebrated San Francisco restaurants which, along with thousands of others, lost substantial business income as a result of government shutdown orders issued during the Coronavirus pandemic. Plaintiffs' restaurants, Nari and Kin Khao (the "Restaurants"), have insurance policies that cover "Lost Business Income" and closure by action of "Civil Authority." Nevertheless, Defendant Oregon Mutual Insurance Company ("OMIC") categorically denied their claims, along with the claims of likely thousands of (proposed) class members, asserting that shutdown orders are not covered by Defendant's insurance policies.

This position is contrary to the relevant insurance policy language. The "shelter in place" orders are covered exercises of "Civil Authority" because they expressly "ordered [restaurants] closed." Dkt. 16-1 at 2. They were issued because Coronavirus can spread by attaching itself to surfaces, particularly in highly trafficked businesses. On that basis, San Francisco authorities expressly issued the orders as responses to "property damage" and "property loss." Dkt. 16-3 at 2.

Plaintiffs' losses are also covered "Lost Business Income." The policies cover "physical loss of or damage to property," which includes an inability to access physical facilities or other harm which impairs the functionality of the premises in which the business operates. *Total Intermodal Servs. Inc. v. Travelers Prop. Cas. Co. of Am.*, No. CV 17-04908 AB (KSX), 2018 WL 3829767, at *3–4 (C.D. Cal. July 11, 2018); *Motorists Mut. Ins. Co. v. Hardinger*, 131 F. App'x 823, 826–27 (3d Cir. 2005). Governmental responses to actual and potential contamination of property inflict such harm and are therefore covered by the policy. There are no exclusions which specifically preclude coverage here or meet the rigorous requirements of California law.

Plaintiffs' losses mirror those of scores of other restaurants around the country suing their insurance companies for categorically refusing to pay any claims for business interruption. The Judicial Panel on Multidistrict Litigation ("JPML") is considering a motion to centralize these many dozens of federal cases, including this one, before a single court. That motion will be heard on July 30, 2020. In the interest of judicial economy, Plaintiffs request that this Court stay its ruling on this motion until the JPML has decided whether or not to transfer this case. If the JPML denies the motion to transfer, this Court should deny OMIC's motion for the reasons above.

## II.   FACTUAL BACKGROUND

**The Restaurants Close:** Kin Khao and Nari are celebrated San Francisco restaurants that infuse traditional Thai recipes with modern California techniques and ingredients. Dkt. 16 ¶ 1. They were created by Pim Techamuanvivit, who won a Michelin star in 2015 during Kin Khao's second year in operation. *Id.* She is currently a finalist for the James Beard award. *Id.*

In mid-March 2020, the Restaurants were ordered to shut down. *Id.* On March 16, 2020, the San Francisco Department of Public Heath proclaimed that "Restaurants . . . are ordered closed except solely for takeout." Dkt. 16-1 at 2. It also prohibited customers, vendors, and employees from traveling to restaurants except when providing or purchasing takeout food. *Id.* This order was extended on March 31, 2020, April 29, 2020 and May 22, 2020 (with modifications not relevant here). Dkt. 16 ¶¶ 35–36. On March 19, 2020 the State of California issued a similar order regarding social distancing: "When people need to leave their homes . . . to obtain [or help provide food] . . . they should at all times practice social distancing." Dkt 16-5 at 2. This order has been similarly extended to the present. These state and local orders, and other related orders impacting the Restaurants, are referred to herein as the "Orders."

The Orders were issued due to direct physical loss of and/or direct physical damage to properties. This fact is reflected in, *inter alia*, an April 10, 2020 proclamation by the City and County of San Francisco, which acted "because of the propensity of the virus to spread person to person and also because the virus physically is causing property loss or damage due to its proclivity to attach to surfaces for prolonged periods of time." Dkt. 16-3 at 2. *See also* Dkt. 16-12 (reflecting similar findings in Los Angeles County) Dkt. 16-13 (reflecting similar findings in Sonoma County). In San Francisco, the virus attached to properties and surfaces on, at, or within properties, thereby furthering its transmission. Dkt. 16 ¶ 67.

Numerous scientific studies have confirmed that Coronavirus particles can attach themselves to surfaces, where they can survive for up to five days. *Id.* ¶¶ 18–25. Although some medical literature suggests that in perfect test conditions particles of Coronavirus can be "inactivated by surface disinfection procedures . . . within 1 minute," (Dkt. 17 at 16:21-22 (ellipses in original)), there is no procedure for ensuring that all surfaces in an entire restaurant

1    are free of Coronavirus and can be kept undamaged while a restaurant operates as normal.

2    Prior to Coronavirus, neither Restaurant offered takeout. Dkt. 16 ¶¶ 112–13. In an attempt

3    to mitigate its damages, Nari re-opened its facilities to offer new takeout products under a new

4    business model. *Id.* at ¶ 113. These efforts have produced extremely modest revenues. *Id.*

5    **The Restaurants' Claims Are Denied:** On or around March 23 and 24, 2020, the

6    Restaurants sought insurance coverage from Defendant. Dkt. 16 ¶¶ 81, 83. Without inspecting the

7    premises, Defendant denied both claims. *Id.* at ¶¶ 82, 84–87. These denials were part of a policy

8    of denying all claims during this pandemic (*id.* at ¶ 88–89), notwithstanding the language of

9    Defendant's policies' civil authority and business income provisions, which state:

10
     f. Business Income . . . We will pay for the actual loss of Business Income you sustain due to the
     necessary suspension of your "operations" during the "period of restoration". The suspension
11   must be caused by direct physical loss of or damage to property at the described premises.

12   i. Civil Authority… We will pay for the actual loss of Business Income you sustain and necessary
     Extra Expense caused by action of civil authority that prohibits access to the described premises
13   due to direct physical loss of or damage to property, other than at the described premises, caused
     by or resulting from any Covered Cause of Loss.

14   Dkt. 16-9 at 12, 14; Dkt. 16-10 at 5, 7. The policies define a "suspension" as a "partial slowdown

15   or complete cessation of your business activities." Dkt. 16-9 at 13; Dkt. 16-10 at 6. They do not

16   define "physical loss" or "physical damage." Dkt. 16-9; Dkt. 16-10.

17   These policy provisions are listed on "Businessowner's Coverage Forms" which are

18   standardized forms drafted by the Insurance Services Office ("ISO"). Dkt. 16 ¶¶ 71, 76.

19   Defendant utilizes these forms as provided and branded by ISO branding, with no modifications.

20   *Id.* In 2006, following consideration of the 2003 SARS-Coronavirus (One) outbreak, the ISO

21   drafted a new endorsement (CP 01 40 07 06) which excluded coverage for viruses. *Id.* ¶ 73.

22   Acknowledging that claims for business interruption losses would be filed under existing policy

23   language for losses in a subsequent pandemic, the ISO explained to state insurance regulators that

24   "Disease-causing agents may . . . enable the spread of disease by their presence on interior

25   building surfaces" giving rise to "potential claims involv[ing] the cost of decontamination" or

26   "business interruption." Dkt. 16 ¶ 73–74. Even after CP 01 40 07 06 was approved and available,

27   OMIC intentionally chose *not* to utilize it in combination with its other ISO forms.

28   **JPML Litigation:** On April 20, 2020, a motion was filed to transfer eleven Coronavirus

1   business interruption insurance cases (filed for the most part by restaurants) to a centralized MDL

2   proceeding. *In re: COVID-19 Business Interruption Insurance Coverage Litigation*, MDL No.

3   2942 Dkt. 1 at 1, 4, Dkt. 1-2 at 1–4. When Plaintiffs brought this claim two weeks later, they filed

4   a notice relating it to the MDL the next day. *Id.* at Dkt. 120 at 1. Since then, scores of other cases

5   have been filed and related to the potential MDL and the motion to coordinate and transfer has

6   been fully briefed and scheduled for argument on July 30, 2020. *Id.* at Dkt. 156 at 1, Dkt. 547 at 1,

7   Dkt. 564 at 1. Plaintiffs filed a brief in support of transfer to a court in the Northern District of

8   California; Defendant opposed coordination and transfer. *Id.* at Dkt. 481 at 10; Dkt. 394 at 1.

9   **III.     REQUEST TO STAY PROCEEDINGS**

10          This Court should temporarily stay these proceedings pending a decision on the motion to

11   transfer being heard on July 30, 2020. This Court's power to stay proceedings is "incidental to the

12   power inherent in every court to control the disposition of the causes on its docket." *Landis v. N.*

13   *Am. Co.*, 299 U.S. 248, 254 (1936). Courts frequently grant stays pending a decision by the MDL

14   panel regarding whether to transfer a case. *See, e.g., Good v. Prudential Ins. Co. of Am.*, 5 F.

15   Supp. 2d 804, 809 (N.D. Cal. 1998). Factors relevant to this analysis include (1) prejudice to the

16   non-moving party; (2) hardship to the moving party if the action is not stayed; and (3) judicial

17   economy. *Rivers v. Walt Disney Co.*, 980 F. Supp. 1358, 1360 (C.D. Cal. 1997).

18          A short stay would impose minimal prejudice on the parties. If the transfer is denied, the

19   August 7 hearing could be rescheduled for later in the month. Defendant will incur no additional

20   costs in that scenario, because discovery has not yet begun (and would be stayed). Indeed, a stay

21   saves Defendant, as well as Plaintiffs and the Court, from preparing for and conducting a hearing

22   that may be rendered moot by the JPML panel's decision. That potential hardship, and parallel

23   concern for judicial economy, militates in favor of a stay. Applying a similar analysis, a district

24   court in the Western District of Washington recently stayed a similar class action against

25   Defendant.[1] *Nue LLC v. Oregon Mutual Insurance Company*, 2:20-cv-00676-RSL, Dkt. 24.

26   Around the country, numerous courts have stayed other Coronavirus business interruption cases

27

28   [1] In the other related case Defendant identified to the MDL, the motion to stay is still pending.
    *Dakota Ventures, LLC v. Oregon Mutual Insurance*, 3:20-cv-00630-HZ (D. Or. 2020), Dkt. 24.

1   pending the decision of the JPML. *See, e.g.*, *Camp 1382 LLC v. Lancer Insurance Company*,

2   1:20-cv-03336-RA (S.D.N.Y., 2020), Dkt. 9; *Accents in Sterling, Inc. v. Liberty Mutual*

3   *Insurance Group, et al.*, 1:20-cv-11005 (D. Mass. 2020), Dkt. 10. Given the upcoming hearing

4   date, erring on the side of caution will not result in substantial delay and will help ensure against

5   inconsistent rulings.

6   **IV.   PRINCIPLES OF INSURANCE POLICY INTERPRETATION**

7        Under California law, "insurance coverage is interpreted broadly so as to afford the

8   *greatest possible protection* to the insured." *MacKinnon v. Truck Ins. Exch.*, 31 Cal. 4th 635, 648

9   (2003) (emphasis added). Exclusions must be plainly stated and are strictly construed against the

10  insurer who drafted the policy. *Id.; see also Gray v. Zurich Ins. Co.*, 65 Cal. 2d 263, 269–71

11  (1966). Whether on this motion or even at summary judgment, courts "have no occasion to

12  determine which of the various proposed interpretations of [a] clause [of an insurance policy] is

13  the 'correct' one, for under settled principles so long as coverage is available *under any*

14  *reasonable interpretation of an ambiguous clause*, the insurer cannot escape liability." *State*

15  *Farm Mut. Auto. Ins. Co. v. Jacober*, 10 Cal. 3d 193, 197 (1973) (emphasis added); *see also*

16  *Reese v. Travelers Ins. Co.*, 129 F.3d 1056, 1060 (9th Cir. 1997). By contrast, the insurer may

17  prevail only by showing that its interpretation "is the *only* reasonable" one. *MacKinnon*, 31 Cal.

18  4th at 655. A policy provision that is susceptible to multiple reasonable readings is ambiguous.

19  *E.M.M.I., Inc. v. Zurich Am. Ins. Co.*, 32 Cal. 4th 465, 470 (2004). Policy language must be

20  "'interpreted as a whole . . . . The proper question is whether the [provision or] word is

21  ambiguous in the context of *this* policy and the circumstances of *this* case.'" *Id.* (citations

22  omitted). Policy language must be construed as a lay person—not an attorney or insurance

23  professional—would read it. *AIU Ins. Co. v. Superior Court*, 51 Cal. 3d 807, 821–22 (1990).

24  **V.   ARGUMENT**

25      **A.   Plaintiffs' Civil Authority Claim is Based on a Reasonable Interpretation of the Policy.**

26          **1.   The Orders Were Issued In Response to Physical Damage.**

27      The Orders were issued in response to physical damage and loss. Contamination by

28  harmful microscopic materials causes such physical harm. *See, e.g.*, *Port Auth. of New York &*

1   *New Jersey v. Affiliated FM Ins. Co.*, 311 F.3d 226, 232, 236 (3d Cir. 2002) (finding "physical

2   loss or damage" could follow from actual or "imminent threat of asbestos release"). Defendant's

3   motion does not contest this point, arguing instead that even if Coronavirus causes physical harm,

4   the Orders "were not issued due to any direct physical [harm] to property." Dkt. 17 at 18:16. [2]

5        This argument mischaracterizes the record. OMIC repeatedly asserts that "[n]owhere in

6   any of those orders did any government official state that they were issued due to some physical

7   loss of or damage to property." *Id.* at 18:19–21; *see also id.* at 8:10–12. This is demonstrably

8   false. On April 10, 2020, Mayor Breed issued a Mayoral Proclamation stating that "[t]his order

9   and *the previous orders issued during this emergency have all been issued* because of the

10  propensity of the virus to spread person to person and also because the virus *physically is causing*

11  *property loss or damage* due to its proclivity to attach to surfaces for prolonged periods of time."

12  Dkt. 16-3 at 2 (emphasis added).[3] As Defendant itself has argued, the language of the Orders

13  themselves should decide this question because they "specifically explained why they were

14  issued." Dkt. 17 at 18:16–18. Therefore, under OMIC's own approach, its motion must fail.

15       Additionally, contrary to OMIC's assertion, these governmental responses to property

16  damage are part and parcel of a strategy to reduce Coronavirus infections. Defendant's motion

17  posits a false dichotomy between "protect[ing] the public's health from the spread of Covid-19"

18  and responding to property damage. *Id.* at 18:18–21. But because contaminated surfaces help

19  spread the virus, San Francisco determined that containing it requires reducing contact with

20  surfaces in high-traffic businesses like restaurants. Dkt. 16-3 at 2 ("To reduce the spread of the

21  virus and protect the public health, the Stay Safe At Home Order prohibits restaurants in the City

22  from offering dine-in service.") Thus, cases like *United Air Lines, Inc. v. Insurance Co. of the*

23  *State of Pennsylvania*, 439 F.3d 128 (2d Cir. 2006), support Plaintiffs' position and not OMIC's.

24  There, the post-9/11 airport shutdown "had nothing to do with repairing, mitigating, or

25  responding to the damage caused by the attack...." *Id.* at 135; Dkt. 17 at 18:23–19:1. The opposite

26

27  _____
    [2] If OMIC later argues that the spread of Coronavirus is incapable of causing physical damage,
    authority introduced in §IV(B)(2) *supra* rebuts that proposition. *See also* Dkt. 16 ¶¶ 18–25.

28  [3] This statement incorporates by reference the local orders at issue in this matter. *Id.* at 1–2.

1   is the case here, where restaurants were shut down to mitigate the spread of Coronavirus.[4]

2   Because the Orders responded to property damage and loss, they are covered injuries.

3   ## 2.   The Orders Prohibited Access to the Restaurants.

4       The shutdown Orders triggered civil authority coverage also because they "prohibit[ed]

5   access to the [insured] premises." The most direct loss of access here was by the Restaurants'

6   employees, who were prohibited from accessing the Restaurants to work at their regular jobs

7   serving customers in dining rooms. *See* Dkt. 16-1 at 5–6; 16-2 at 4-5 (limiting travel to

8   restaurants to preparing or obtaining takeout food). Because neither Restaurant offered takeout

9   service when the Orders were issued, this amounts to a total denial of access. Even months later,

10  the Orders left Kin Khao with no way to access or operate its small restaurant and kitchen in any

11  way whatsoever. *See* Dkt. 16 ¶¶ 47, 50, 52, 112; Dkt 16-5 at 2 (requiring social distancing). The

12  denial of access here is so broad that the Orders characterize these restrictions as a form of

13  closure. Dkt. 16-1 at 2, 16-2 at 24 ("Restaurants . . . are ordered closed except solely for takeout

14  and delivery service.") In this way, the Restaurants lost all or nearly all access to their premises,

15  and particularly their dining rooms, service areas, and other related facilities.

16      Independently, the prohibition on customer access to the Restaurants establishes coverage

17  as well. *54th St. Ltd. Partners, L.P. v. Fid. & Guar. Ins. Co.*, 763 N.Y.S.2d 243, 244 (2003)

18  (finding that government orders blocking customer access to a restaurant trigger civil authority

19  coverage). Defendant's motion focuses myopically on the potential access available to

20  employees, without addressing Plaintiffs' other theories. The policy language only requires a

21  prohibition on access which causes harm—and thus, a prohibition of access of any one category

22  of people, whether customers, employees or policyholders, triggers coverage. The policy contains

23  no language requiring that such prohibitions limit the movement of the policyholders and their

24  employees. Ex. 9 at p. 14; Ex. 10 at p. 7 (referring specifically to the lost income "you"—the

25  policyholder—sustains, but generically to "[order] that prohibits access to the described

26  _____

27  [4] *Dickie Brennan & Co. v. Lexington Ins. Co.*, 636 F.3d 683 (5th Cir. 2011), similarly involves factual holes not present here, that finding physical damage from a hurricane across an ocean was not "in the proximity of the insured's property." *Id.* at 687. Here, by contrast, Coronavirus caused

28  physical damage in in buildings and streets all around Plaintiffs' restaurants. Dkt. 16 ¶¶ 66–67.

1   premises"—with no subject—later in the sentence). Plaintiffs' customers were prohibited from

2   accessing the interior of the insured restaurants as well. Dkt. 17 at 14; 20–21; Dkt. 16 ¶¶ 46–49.

3   Each instance of a customer not accessing the Restaurants because of the Orders reduces the

4   Restaurants' income, thereby satisfying every element of the civil authority claim.

5           The precedent cited by Defendant raises no questions about the existence of coverage

6   here. In *Syufy Enterprises v. Home Ins. Co. of Indiana*, No. 94-0756 FMS, 1995 WL 129229

7   (N.D. Cal. Mar. 21, 1995), for example, there was no direct governmental restriction whatsoever

8   on the movie theatre businesses in question, only a generalized "dawn to dusk" curfew in

9   response to rioting that caused the insured to choose to close. *Id.* at *2.[5] There were no

10  restrictions on employees and customers making full use of the theatre from sun up to sun down.

11  By contrast, in other cases where similar orders in response to rioting expressly required the

12  closure of businesses, civil authority coverage applied. *See, e.g., Southlanes Bowl, Inc. v.*

13  *Lumbermen's Mut. Ins. Co.*, 46 Mich. App. 758, 760 (1973). Here, because the Orders directly

14  prohibited Plaintiffs from conducting business, civil authority coverage applies.

15          If this Court determines that the civil authority coverage allegations were well pled, it

16  should overrule the entire demurrer on that basis alone. Regardless of whether allegations

17  involving other coverage were well pled, the existence of a viable civil authority claim is

18  sufficient to support all causes of action in the Complaint (which arise from several wrongful

19  denials of insurance coverage). In such a situation, as this Court has previously held, there is no

20  basis for dismissing or striking any aspect of the Complaint. *See, e.g., Lotes Co. v. Hon Hai*

21  *Precision Indus. Co.*, No. C 11-01036 JSW, 2011 WL 13152817, at *2–3 (N.D. Cal. July 14, 2011)

22  (finding that only entire claims may be subject to a motion to dismiss, which is not a vehicle to "strike

23  certain allegations" concerning portions of a contract allegedly not breached while leaving allegations

24  of other breaches of the contract sufficient to sustain the cause of action intact). Accordingly, because

25  the civil authority claim is well pled, the Court should deny Defendant's motion to dismiss.

26  _____

27  [5] *Philadelphia Parking Auth. v. Fed. Ins. Co.*, 385 F. Supp. 2d 280 (S.D.N.Y. 2005), is flawed in
    the same respect: plaintiff failed to allege a direct governmental restriction on business. *Id.* at 289
    ("While this unprecedented order [grounding flights] may have temporarily obviated the need for

28  Plaintiff's [airport] parking services, it did not prohibit access to Plaintiff's garages.").

**B.**   **Plaintiffs' Business Income Claim is Based on a Reasonable Interpretation of the Policy.**

**1.**   **Defendant Ignores the Term "Loss" Whose Plain Meaning Extends Coverage Beyond Material Transformations of Property.**

The structure of Defendant's argument shows why it must fail. Although coverage is available under the policy for "physical loss of or damage to property," OMIC does not interpret each term or advance specific arguments against coverage under each prong. Dkt. 17 at 12:12–15:12. Instead, OMIC adopts a singular definition of the scope of coverage—"an external force [that] cause[s] a physical change in the condition of the Restaurant's property" (Dkt. 17 at 15:20-24). This interpretation appears to be rooted entirely in the term "physical damage," with no meaning given to the term "physical loss".

However, this Court must "give effect to 'every part' of the policy, with 'each clause helping to interpret the other[,]'" and "avoid rendering terms surplusage." *Palmer v. Truck Ins. Exch.*, 21 Cal. 4th 1109, 1115 (1999); *Farmers Ins. Exch. v. Knopp*, 50 Cal. App. 4th 1415, 1421 (1996). OMIC violates this principle by only interpreting "physical damage" and providing no independent meaning to "physical loss." A federal district court in California has rejected this exact approach, finding that it impermissibly renders the term "loss of…property" meaningless, violating bedrock principles of policy interpretation. *Total Intermodal Servs.*, No. CV 17-04908 AB (KSX), 2018 WL 3829767, at *3–4 (C.D. Cal. July 11, 2018) (rejecting the argument that property which was loaded onto a ship and became unlocatable and inaccessible as a result of third-party conduct was not covered because that conduct did not materially alter the cargo). *See also Nautilus Grp., Inc. v. Allianz Glob. Risks US*, No. C11-5281BHS, 2012 WL 760940, at *6–7 (W.D. Wash. Mar. 8, 2012). The court held that the term "loss" covers dispossession of or inability to access property, and has a potential scope potentially far broader than the term physical damage. *Id.* at 3, 4, n.4. *See also Universal Sav. Bank v. Bankers Standard Ins. Co.*, No. B159239, 2004 WL 515952, at *6 (Cal. Ct. App. Mar. 17, 2004) (finding that physical loss includes dispossession), *vacated on other grounds*, No. B159239, 2004 WL 3016644 (Cal. Ct. App. Dec. 30, 2004) (unpublished). If OMIC prefers an alternative definition of the term "physical loss," it should have defined that term in its policy.

In defining "loss" and finding coverage, *Total Intermodal* distinguished *MRI Healthcare Ctr. of Glendale, Inc. v. State Farm Gen. Ins. Co.*, 187 Cal. App. 4th 766 (2010), because the latter interpreted the phrase "loss *to* property." *Total Intermodal Servs.*, 2018 WL 3829767, at *4 (emphasis added). While "loss *to* property" could suggest an external force acting on property, "loss *of* property" connotes dispossession or similar harm which is not localized on parts of the property (e.g., loss of use *of* property). *Id.* Like *Total Intermodal*, Plaintiffs' policies cover "loss of" property, so *MRI Healthcare* does not apply. Dkt. 16-9 at 12; Dkt. 16-10 at 5.

Plaintiffs here suffered a physical loss. Like the policyholder in *Total Intermodal*—whose physically intact cargo became inaccessible and unusable—Plaintiffs were unable to access and utilize the Restaurants' physical facilities. If OMIC wanted to limit coverage to material alterations, it should have defined the term "loss" in its policies (or excluded it entirely). Plaintiffs' interpretation is the only reasonable one because—unlike Defendant's—it gives meaning to every term in the policy, as required by California law. *Palmer*, 21 Cal. 4th at 1115; *Knopp,* 50 Cal. App. 4th at 1421. Defendant's interpretation must be rejected as a matter of law.

Underscoring the reasonability of Plaintiffs' interpretation, the U.S. Supreme Court has used the term "loss" in the same manner. When evaluating whether a government regulation of real property constitutes a taking under the Fifth Amendment, the Supreme Court analyzes whether the owner has suffered a "complete elimination of value" or "*total loss*" of property. *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 330 (2002) (finding that a temporary prohibition on construction was a regulatory taking) (emphasis added). As here, these cases concern property physically in the owner's possession without any physical change in conditions or other harm besides regulations. *Id.* This underscores that Plaintiff's usage of the term "loss" is—at a bare minimum—consistent with the reasonable understanding of a policyholder because the Supreme Court has been using the term "loss" with that same meaning vis-à-vis regulation of real property for *almost a century. See, e.g., Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 414–16 (1922) (finding that a regulation making coal mining "commercially impracticable" placed too much of "the loss" on the mine owner instead of the public). Moreover, as demonstrated below, the term "loss," along with the term damage, also

1    incorporates the loss of functionality of property.

2                   **2.**     **Deprivation of Functionality Triggers Coverage.**

3        Defendant's narrow reading of "direct physical loss of or damage to property" ignores

4    impairments to the functionality of property. Defendant's argument parallels the appeal of the

5    defendant carrier in *Hughes v. Potomac Ins. Co. of D.C.*, 199 Cal. App. 2d 239 (Ct. App. 1962),

6    which sought to vacate a judgment that it had breached its insurance contract, arguing that a

7    house relocated but not sullied by a landslide was not covered because the house itself had not

8    suffered any "physical loss" or "damage." *Id.* at 242, 246. Refusing to read these terms narrowly,

9    the First District Court of Appeal wrote:

10           To accept appellant's interpretation of its policy would be to conclude that a building . . .
             which has been placed in such a position as to overhang a steep cliff has not been
11           'damaged' so long as its paint remains intact and its walls still adhere to one another.
             Despite the fact that a 'dwelling building' might be rendered completely useless to its
12           owners, appellant would deny that any loss or damage had occurred unless some tangible
             injury to the physical structure itself could be detected. Common sense requires that a
13           policy should not be so interpreted[.]

14   *Id.* at 248–49. Although *Hughes* was subsequently abrogated on other grounds by *Sabella v.*

15   *Wisler*, 59 Cal. 2d 21, 34 (1963), its central holding remains good law. *See Strickland v. Fed. Ins.*

16   *Co.*, 200 Cal. App. 3d 792, 799 (Ct. App. 1988) (extending *Hughes* and underscoring that it

17   applies to properties rendered no longer reasonably usable, and does not require a total loss).

18       As in *Hughes*, loss of functionality is a form of physical loss of property, which can be

19   triggered by government orders and the spread of hazardous materials. Based entirely upon

20   *Hughes*, the Supreme Court of Colorado found that a fire department order closing a church

21   surrounded by gasoline "equates to a direct physical loss" under the church's property insurance

22   policy. *W. Fire Ins. Co. v. First Presbyterian Church*, 165 Colo. 34, 40 (1968) (*citing Hughes*,

23   199 Cal. App. 2d 239, and no other cases). Other courts, like the Third Circuit, reached similar

24   conclusions, finding that chemical contaminations which "nearly eliminate[]" the function of a

25   property or render it "useless or uninhabitable" trigger coverage. *Port Auth. of New York & New*

26   *Jersey*, 311 F.3d at 232, 236 (finding that an actual or "imminent threat of asbestos release" in a

27   train station could constitute "physical loss or damage"). *See also Essex Ins. Co. v. Bloom South*

28   *Flooring Corp.*, 562 F.3d 399, 406 (1st Cir. 2009) (finding that "odor can constitute physical

1   injury to property under Massachusetts law"); *Farmers Ins. Co. of Oregon v. Trutanich*, 123 Or.

2   App. 6, 9-11 (1993) (finding that "odor is a direct physical loss.")

3        This functionality analysis applies in equal force to "sources [of damage] unnoticeable to

4   the naked eye," like bacteria. *Motorists Mut. Ins. Co. v. Hardinger*, 131 F. App'x 823, 826–27 (3d

5   Cir. 2005) (finding viable claims for loss of functionality, usability, and inhabitability where e-

6   coli contaminated the well water on which a property depends) (*citing Port Auth.*, 311 F.3d at

7   236). Analyzing parallel facts in this district, Judge Walker appears to have reached a similar

8   conclusion in *Cooper v. Travelers Indem. Co. of Illinois*, No. C-01-2400-VRW, 2002 WL

9   32775680 (N.D. Cal. Nov. 4, 2002), where well water contaminated with e-coli forced the closure

10  of a tavern. *Id.* at *1-2. Following a bench trial, he issued findings of fact and conclusions of law

11  indicating that "a necessary suspension of [Plaintiff's] operation of the tavern [had] resulted from

12  direct physical damage to the property at the insured premises." *Id.* at *1-2, 5. Following

13  discovery, this Court is likely to reach the same conclusion here.

14       Plaintiffs lost functionality of their Restaurants' premises following the Orders, thereby

15  triggering coverage. The policy language should be read broadly as to functionality because the

16  policies at issue here are "all risk" policies. Dkt. 16 at ¶¶ 59-60. As Defendant's motion concedes:

17  "[u]nquestionably, the Restaurants suspended their dining room operations as a result of the

18  governmental Orders." Dkt. 17 at 14; 20-21. This inability to use their dining room for any

19  purpose parallels plaintiffs' inability to use the home in *Hughes*, the church in *W. Fire Ins.*, and

20  the train station in *Port Auth. of New York*. The impairment of functionality is sufficient to

21  constitute a "suspension of your operations" under the policy, which defines suspension as

22  including a "slowdown" in business. Dkt. 16-9 at 12; Dkt. 16-10 at 5.

23       Even to the extent Nari was able to start a new takeout business as a way to mitigate

24  certain damages, it still completely shuttered its original business and lost use of its entire dining

25  room and the property within it (tables, chairs, plates, etc.). Dkt. 16 at ¶ 113. Since at least some

26  property on its premises lost functionality in connection with its reduction in operations, it

27  suffered losses sufficient to trigger coverage. Underscoring this, the San Francisco orders

28  characterize their restrictions as requiring a closure. Dkt. 16-1 at 2, 16-2 at 2 ("Restaurants . . . are

1    ordered closed except solely for takeout and delivery service.")

2          Defendant's argument about "cleaning" surfaces exposed to the virus (Dkt. 17 16:15–

3    17:2) is unavailing. *Mama Jo's, Inc. v. Sparta Ins. Co.*, No. 17-CV-23362-KMM, 2018 WL

4    3412974 (S.D. Fla. June 11, 2018), supports Plaintiffs' position by engaging in a similar

5    functionality analysis. *Id*. at *9. The court there found no loss of functionality because "the

6    restaurant was not 'uninhabitable' or 'unusable[, they] remained open every day" with no "impact

7    on the operation other than requiring daily cleaning." *Id.* Nor is the dust problem in *Mama Jo's*

8    comparable to the severity of the Coronavirus nor its impact on the Restaurants. *See Trutanich*,

9    123 Or. App. at 9-11 (finding the costs of cleaning and odor that impaired functionality was a

10   direct physical loss). Unlike dust, a business cannot operate with traces of Coronavirus on

11   surfaces, which is why governments shut down businesses for months rather than ordering them

12   to clean their surfaces frequently. Nor is cleaning a workable solution. *See* § II, *supra*.

13         OMIC also argues that the Orders are disconnected from any physical harm. Dkt. 17 at

14   16:6–10. To the contrary, the Orders were issued in response to Coronavirus-induced physical

15   damage and loss. *See* § IV(A)(1), *supra*. The fact that the Orders were directed at "all businesses

16   in San Francisco, regardless of the presence or absence of the virus" with "no exceptions if a

17   business could establish the virus was not present" (*id.* at 4–8), only underscores the severity of

18   the restrictions and the necessity for the shutdowns. Because the Restaurants were required to

19   shut down, they lost functionality triggering coverage.

20         **3.      Defendant Has Not Established that a Material Change in Condition is
                      Required.**

21

22         No case cited by Defendant requires a rejection of the functionality analysis above. In

23   *MRI Healthcare Ctr. of Glendale, Inc. v. State Farm Gen. Ins. Co.*, 187 Cal. App. 4th 766 (2010),

24   a California court found no coverage where an MRI machine suffered damage following an

25   attenuated series of events beginning with physical damage to a roof; the conduct that actually

26   harmed the MRI machine was the insured's knowing and deliberate decision to power it down for

27   a long period of time. *Id.* at 780. Here, by contrast, the harm was direct and attributable to a

28   single, external cause: the Restaurants were ordered to shut down, so they shut down. *Source*

1   *Food Tech., Inc. v. U.S. Fid. & Guar. Co.*, 465 F.3d 834 (8th Cir. 2006), considered the

2   implications of a government order restricting Canadian beef imports but found no loss of

3   property because the beef, which was raised, slaughtered, and packaged in Canada remained

4   sellable in Canada; the only loss in utility was the ability to export that beef to the U.S. *Id.* at 838.

5   Here, by contrast, the regulations required a total shutdown of the dining rooms to all customers.

6        Moreover, *US Source Food Tech* gave express consideration to cases finding that

7   governmental regulations in combination with chemical contamination can constitute physical

8   loss and damage. *Id.* at 836–7. Based on the Eighth Circuit's efforts to distinguish these cases

9   (*id.*), it is clear that it did not reject the holding of cases like *Gen. Mills, Inc. v. Gold Medal Ins.*

10  *Co.*, 622 N.W.2d 147 (Minn. Ct. App. 2001). In that case, the court found "an impairment of

11  function and value sufficient to support a finding of physical damage" where oats were treated

12  with pesticides that were harmless to consumers but banned by FDA regulations. *Id.* at 150, 152.

13  Here, because the Orders rendered the dining rooms unusable, *Gen. Mills*—where the court found

14  coverage—not *Source Food Tech*—where it did not—applies.

15       Defendant's argument concerning the "period of restoration" also does not undermine the

16  functionality analysis. Dkt. 17 at 17:9–19. The term "restore" encompasses bringing a business

17  back to its regular operations." *See Merriam Webster Dictionary*, www.merriam-

18  webster.com/dictionary/restore (defining "restore" as "to bring back to or put back into a former

19  or original state."); *Santa Clara Cty. v. Curtner*, 245 Cal. App. 2d 730, 749 (Ct. App. 1966)

20  (utilizing the phrase "restore access to . . . the property"). The "period of restoration" is also

21  defined by the policy as encompassing "replace[ment]" (*id.* at Dkt. 17 at 17:12), which

22  demonstrates that it includes "losses" of property or irreparable chemical contamination.

23  Moreover, using the period of restoration language to limit losses that are covered, as OMIC

24  suggests, would be contrary to California law, which abhors the use of subtle references in later

25  provisions and unclear language to limit or exclude coverage, and requires that such language be

26  "conspicuous, plain and clear." *See State Farm Mut. Auto. Ins. Co.*, 10 Cal. 3d at 200–1.

27       Here, the policy language as a whole supports the functionality interpretation, and

28  underscores that Plaintiffs' interpretation is at least reasonable. The policy expressly defines

"Property damage" as meaning "Physical injury to tangible property, including all resulting loss of use of that property." *See* Dkt. 16-9 at 43; 16-10 at 36. A related definition similarly refers to "loss of use." Dkt. 16-9 at 56 ("'Property damage' means physical injury to, or destruction of, tangible property including the loss of use thereof, or loss of use of tangible property, which has not been physically injured or destroyed.") These understandings of "damage" undermine any suggestion that it requires material alteration. *Motorists Mut. Ins. Co.*, 131 F. App'x at 826–27, n.2 (finding that such policy provisions support functionality); *TRAVCO Ins. Co. v. Ward*, 715 F. Supp. 2d 699, 709-10 (E.D. Va. 2010), *aff'd*, 504 F. App'x 251 (4th Cir. 2013) (same). The policy also includes language confirming that "contamination by a 'hazardous substance,'" as in the functionality cases, is a covered cause of loss and that such substances can cause "physical damage." Dkt. 16-9 at 60, 62. *See also id.* at 68 (recognizing that bacteria can cause "direct physical loss or damage."). Given Defendant's use of such language in its policies, it cannot credibly argue that there is no reasonable way to interpret them as covering harm to functionality.

OMIC's omission of a virus exclusion underscores this point. All coverage provisions being litigated here are part of an ISO "Businessowner's Coverage Forms" that Defendant chose to utilize without adaptation. Dkt. 16 ¶¶ 71, 76. The ISO's decision to offer a virus exclusion endorsement after SARS-Coronavirus (One) acknowledges that virus induced damage is covered by the original form. *Id.* ¶ 73. As ISO explained to state regulators: "Disease-causing agents may . . . enable the spread of disease by their presence on interior building surfaces" which may result in claims for "decontamination" or "business interruption." *Id.* ¶¶ 73–74. OMIC's decision not to add this virus exclusion to its policies using ISO forms, while continuing to use these forms unmodified for 14 years—in combination with ISO's statements and conduct as the drafter of the policy language at issue—should remove any doubt that Coronavirus losses are covered.

### C.      No Policy Exclusions Apply to These Losses.

Plaintiffs' losses are not subject to any policy exclusions. Exclusions are construed narrowly with ambiguities read against the insurer, who must clearly and specifically express any limitations that apply in language that could be plainly understood by a policyholder. *Gray*, 65 Cal. 2d at 269–71; *State Farm Mut. Auto. Ins. Co.*, 10 Cal. 3d at 201-2. First, the "ordinance or

1  law" exclusion does not apply to the Orders, which are exercises of executive branch emergency

2  powers not "enforcement of any ordinance or law." Dkt. 16-1 at 3–4; Dkt. 16-5 at 1. Moreover,

3  the full language of the exclusion, and related coverage provisions, make clear that this language

4  concerns construction regulations and "use" should not be read in a manner radically broader than

5  the terms "construction" and "repair," with which it is listed. *See* Dkt. 16-9 at 18; Dkt. 16-10 at

6  11. *See also* Dkt. 16-9 at 14–15; Dkt. 16-10 at 7–8. Indeed, reading "use" as broadly as Defendant

7  seeks would also impermissibly render "construction" and "repair" meaningless. *See* § IV(B)(1),

8  *supra*. Thus, the "ordinance or law exclusion" does not apply.

9     Second, "act or decisions" exclusion is extraordinarily vague, failing to identify the

10  conduct it encompasses. *See* Dkt. 16-9 at 21; Dkt. 16-10 at 14. Every potential cause of loss—or

11  other human activity anywhere on earth—is necessarily the result of an "act[] or decision[]" by at

12  least one "person" or "organization." *Id.* This single sentence exclusion either eliminates all

13  coverages in the policy, creating an illusory contract, or is meaningless.

14     Neither of the above exclusions applies to civil authority, which is express coverage for

15  governmental decisions limiting the use of property. The broad reading Defendant advances here

16  would read all civil authority coverage under the policies into oblivion. Excluding all coverage

17  from an express provision is a prohibited form of illusory coverage. *Shade Foods, Inc. v.*

18  *Innovative Prod. Sales & Mktg., Inc.*, 78 Cal. App. 4th 847, 873–74 (2000), *as modified on denial*

19  *of reh'g* (Mar. 29, 2000) (holding that an exclusion must be interpreted in the context of the policy

20  as a whole which cannot provide illusory coverage); *Edmunds Mgmt. Co. v. Century Sur. Co.*,

21  No. 70441, 1997 WL 321119, at *2–3 (Ohio Ct. App. June 12, 1997) (finding that the ordinance

22  or law exclusion cannot eliminate a category of coverage). Additionally, as explained in

23  § IV(B)(3), ISO's 2006 virus exclusion precludes all these arguments; it shows that viruses were

24  covered under this policy, meaning no prior exclusion should be read to apply.

25  **VI.  <u>CONCLUSION</u>**

26     For the foregoing reasons, OMIC's motion should be stayed or denied. Should this Court

27  grant OMIC's motion in any regard, Plaintiffs respectfully request leave to amend their pleading

28  to cure any defects.

1

2    Dated:  July 13, 2020                    Respectfully submitted,
                                              */s/ Robert J. Nelson*
3                                             Robert J. Nelson (State Bar No. 132797)
                                              Fabrice N. Vincent (State Bar No. 160780)
4                                             Jacob H. Polin (State Bar No. 311203)
                                              LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
5                                             275 Battery Street, 29th Floor
                                              San Francisco, CA  94111-3339
6                                             Telephone:  415.956.1000
                                              Facsimile:  415.956.1008
7

8                                             Alexandra L. Foote (State Bar No. 225695)
                                              LAW OFFICE OF ALEXANDRA L. FOOTE, P.C.
9                                             275 Battery Street, 29th Floor
                                              San Francisco, CA  94111-3339
10                                            Telephone:  786.408.8083
                                              Facsimile:  415.956.0561
11
                                              *Attorneys for Plaintiffs*
12                                            Nari Suda LLC and Pakin Corporation

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## **CERTIFICATE OF SERVICE**

2      I, Jacob Polin, hereby certify that on July 13, 2020, I caused to be electronically filed the

3  above document and accompanying proposed orders with the Clerk of the United States District

4  Court for the Northern District of California using the CM/ECF system, which shall send

5  electronic notification to all counsel of record.

6                          */s/          Jacob H. Polin*

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

OPPOSITION TO MOTION TO DISMISS AMENDED
COMPLAINT AND REQUEST TO STAY PROCEEDINGS
CASE NO. 4:20-CV-3057-JSW